1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEBRASKA
 2

 3     THE UNITED STATES OF AMERICA,    )    Case No. 8:15CR343-3
                                        )
 4                      Plaintiff,      )
                                        )
 5              vs.                     )
                                        )
 6     GREGORY BAHATI,                  )
                                        )    Omaha, Nebraska
 7                      Defendant.      )    June 22, 2017

 8

 9           PARTIAL TRANSCRIPT OF SENTENCING PROCEEDINGS
                        WITNESS CORY SHELTON
10          BEFORE THE HONORABLE JOSEPH F. BATAILLON
                UNITED STATES SENIOR DISTRICT JUDGE
11

12

13                     A-P-P-E-A-R-A-N-C-E-S

14     FOR THE PLAINTIFF:           Mr. Matthew R. Molsen
                                    Assistant U.S. Attorney
15                                  487 Federal Building
                                    100 Centennial Mall North
16                                  Lincoln, Nebraska 68508

17     FOR THE DEFENDANT:           Mr. Adam J. Sipple
                                    Johnson & Mock
18                                  9900 Nicholas Street
                                    Suite 225
19                                  Omaha, Nebraska 68114

20

21     COURT REPORTER:             Ms. Susan M. DeVetter, RDR, CRR
                                    Official Court Reporter
22                                  Hruska Courthouse, Suite 3130
                                    111 South 18th Plaza
23                                  Omaha, Nebraska 68102-1322
                                    (402) 661-7309
24

25     Proceedings recorded by mechanical stenography, transcript
       produced with computer.
```

1          MR. MOLSEN:  Yes, Your Honor.  Government would call

2    Cory Shelton.

3          THE COURT:  Agent -- or if you'll just come to the

4    front, we'll swear you in.

5       Right there's fine.

6          COURTROOM DEPUTY:  Would you please state your full

7    name, spelling your last name for the record.

8          THE WITNESS:  Cory --

9          COURTROOM DEPUTY:  And your first.

10         THE WITNESS:  Cory, C-O-R-Y.  Last name Shelton,

11   S-H-E-L-T-O-N.

12           CORY SHELTON, PLAINTIFF'S WITNESS, SWORN

13         THE COURT:  You may proceed, Mr. Molsen.

14         MR. MOLSEN:  Yes, sir.  Thank you.

15                       DIRECT EXAMINATION

16   BY MR. MOLSEN:

17   Q.   Mr. Shelton, how are you currently employed?

18   A.   I'm currently employed as a Special Agent with the Bureau

19   of Alcohol, Tobacco, Firearms and Explosives.

20   Q.   And how long have you worked in that capacity?

21   A.   A little over three years.

22   Q.   What are your current duties with ATF?

23   A.   Currently assigned to investigate firearms, violent crime

24   and narcotics offenses.

25   Q.   Have you been involved in the investigation with this

 1    case?

 2    A.    Yes, I have.

 3    Q.    Related to that, have you reviewed reports regarding a

 4    search warrant that was executed by the Omaha Police Department

 5    on April 23rd of 2015?

 6    A.    Yes, I have.

 7    Q.    And are you familiar with -- or do you know whose house

 8    that was?

 9    A.    I believe the house belonged to Rita White, Jermaine

10    Finley's grandmother.

11    Q.    And according to the reports, was Mr. Jermaine Finley, was

12    he present in the house at the time the police entered?

13    A.    To my knowledge, yes, he was.

14    Q.    And was Mr. Bahati, the defendant, was he present when

15    police arrived?

16    A.    Yes.

17    Q.    And Mr. Dionte Dortch, the co-defendant, was he also

18    present when the police arrived?

19    A.    Yes.

20    Q.    Were others also present?

21    A.    There were other people present, yes.

22    Q.    When the police executed the search warrant, did they

23    recover any firearms?

24    A.    Yes, they did.

25    Q.    Do you recall approximately how many firearms?

Shelton - Direct                                                    4

1    A.    I believe it's four.

2    Q.    In addition to firearms, were other items seized,

3    including cell phones?

4    A.    Yes.

5    Q.    According to the reports, was one of those -- at least one

6    of those cell phones, was the content of that later extracted

7    by the Omaha Police Department?

8    A.    Yes, it was.

9    Q.    And when the Omaha Police Department extracts data from a

10   phone, is there software that they use to do that?

11   A.    To my knowledge, yes.

12   Q.    And does it produce a report of what was on the phone?

13   A.    Yes.

14   Q.    And as far as, at least to your knowledge, is the idea

15   that it just wants to extract the data without altering the

16   data?

17   A.    That's correct.

18   Q.    Have you had a chance to see the report regarding the

19   extraction of an LG phone seized from the house on that

20   occasion?

21   A.    Yes, I have.

22   Q.    Does the phone, at least according to that report, did it

23   contain video files on the phone?

24   A.    Yes.

25   Q.    And does the software obtain, as far as you understand,

Shelton - Direct                                                    5

1    metadata regarding each video or picture file that's taken off

2    the phone?

3    A.    Yes, it does.

4    Q.    According to the report and according to the software used

5    to extract it, is there a video -- what's on the report is

6    called Video No. 1 or the first video on the report?

7    A.    Yes.

8    Q.    And does that video, according to the report, does it

9    report a creation date?

10   A.    It does.

11   Q.    What's the creation date for Video No. 1?

12   A.    December 6th, 2014.

13   Q.    And is there a Video No. 2?

14   A.    Yes, there is.

15   Q.    And, likewise, does the software report a creation date

16   for that video?

17   A.    Yes, it does.

18   Q.    And what's the creation date for that video?

19   A.    December 19th, 2014.

20   Q.    Have you had a chance to see both of those videos?

21   A.    Yes, I have.

22   Q.    Do both videos depict the defendant, Mr. Gregory Bahati?

23   A.    Yes, they do.

24   Q.    Are firearms being displayed in both videos?

25   A.    Yes.

Shelton - Direct                                                    6

1    Q.    Are there other people present in both videos?

2    A.    Yes.

3    Q.    And does -- those people include Mr. Jermaine Finley as

4    one of the people?

5    A.    Yes.

6            MR. MOLSEN:  Your Honor, the government would offer

7    Exhibits 19 and 20.

8        Let me back up, before I do that.

9    BY MR. MOLSEN:

10   Q.    Video No. 1, does that --  Have you seen a copy of

11   Government's Exhibit 19?

12   A.    Yes, I have.

13   Q.    Is Government's Exhibit 19, is that a true and accurate

14   copy of Video 1 on the report of a cell phone download?

15   A.    Yes, it is.

16   Q.    And have you seen a copy of Exhibit -- Government's

17   Exhibit 20?

18   A.    Yes.

19   Q.    And is that a true and accurate copy of what's shown as

20   Video No. 2 on the report of the cell phone download?

21   A.    Yes, it is.

22   Q.    Okay.

23           MR. MOLSEN:  Your Honor, the government would offer

24   Exhibits 19 and 20.

25           THE COURT:  Any objection?

Shelton - Foundation                                          7

1          MR. SIPPLE:  May I briefly voir dire, Judge?

2          THE COURT:  Yes, you may.

3                    FOUNDATIONAL EXAMINATION

4    BY MR. SIPPLE:

5    Q.   Agent Shelton, with respect to the dates that you referred

6    to in December of 2014, are those -- is your knowledge of those

7    dates taken purely from the extraction report prepared by the

8    forensic computer analyst?

9    A.   Yes, it is.

10   Q.   Do you have any independent knowledge as to whether those

11   dates are accurate?

12   A.   No, I don't.

13          MR. SIPPLE:  Judge, I'd just object based on

14   foundation and relevance.

15          THE COURT:  Well, I think the -- the relevance

16   objection is overruled.  I've had an opportunity to review the

17   content of both tapes -- of both videos.

18       The foundation...

19          MR. MOLSEN:  And if I can respond?

20          THE COURT:  I -- I don't think there's any problem

21   with the foundation.  They were found in the home and they are

22   depictions of the defendant.  So I don't think there's any

23   problem as far as their authenticity.

24       The -- the date that the videos were created may be

25   subject to some debate, but I don't think that that undermines

Shelton - Direct                                                      8

1    the general relevance or the general reliability of the images

2    depicted, so I'm going to overrule the objections.

3         19 and 20 are received.

4              MR. MOLSEN:  And may I approach, Your Honor?

5              THE COURT:  Yes, you may.

6              MR. SIPPLE:  May I approach counsel?

7              THE COURT:  Yes, you may.

8         (Counsel conferred.)

9                   DIRECT EXAMINATION RESUMED

10   BY MR. MOLSEN:

11   Q.   Agent Shelton, handing you Exhibits No. 28 and 29.  As

12   part of this investigation, has law enforcement scoured some

13   social media and looked for photos depicting the defendants in

14   this case?

15   A.   Yes.

16   Q.   And have they also looked to the defendants' Facebook

17   pages?

18   A.   Yes.

19   Q.   And are you familiar -- have you yourself used Facebook

20   before?

21   A.   I have.

22   Q.   Okay.  And looking at Exhibit 28, can you tell us what

23   Exhibit 28 is?

24   A.   Exhibit 28 is a picture.  It contains the -- the words

25   Team Murk.

Shelton - Direct                                                        9

1   Q.   And does it show several people within the photo as well?

2   A.   Yes, it does.

3   Q.   Okay.  According -- does that -- does the picture in

4   Exhibit 28, does it show whose Facebook account that was

5   posted to?

6   A.   I believe it was posted by Johny CameraMan.

7   Q.   Okay.  And so were there other people who would post

8   pictures of the -- of the defendants and the people related to

9   the defendants?

10  A.   Could you ask your question again?

11  Q.   Sure.  Were there people other than the defendants who

12  would also post pictures of the defendants on their Facebook

13  pages?

14  A.   Yes.

15  Q.   And on Exhibit 28, does that -- does it depict the

16  defendant?

17  A.   Yes, it does.

18  Q.   Does it depict a person by the name of Jermaine Finley?

19  A.   Yes, it does.

20  Q.   And based on your investigation, is Mr. Finley associated

21  with the defendant?

22  A.   Yes.

23  Q.   Does it depict a person by the name of Kylonn Haynie?

24  A.   Yes, it does.

25  Q.   Have you received information that Kylonn Haynie is

Shelton - Direct                                                    10

1    associated with this case as well?

2    A.    Yes.

3    Q.    Have you seen a report or grand jury testimony by a -- by

4    a CI working for the government?

5    A.    Yes.

6    Q.    And does that CI -- did he talk about the formation of a

7    group called Murk Squad?

8    A.    Yes, he did.

9         MR. SIPPLE:  Judge, I would object to the form and

10   ask that we specify what informant we're talking about.

11        MR. MOLSEN:  And obviously we don't want to name the

12   informant.

13        THE COURT:  You have an informant number though,

14   correct?

15        MR. SIPPLE:  Right.

16        MR. MOLSEN:  Yes, Your Honor.

17        THE COURT:  Okay.

18        MR. MOLSEN:  And I believe it's -- the informant

19   number was given and actually the report that I'm referencing

20   is one of the defense exhibits that's been received.

21        THE COURT:  Correct.  That's my understanding.

22        MR. MOLSEN:  Yeah.  So that's the informant we're

23   referring to.

24        THE COURT:  Okay.

25        MR. SIPPLE:  Can I just...

Shelton - Direct                                                    11

1              THE COURT:  Yes, you may.

2         (Counsel conferred.)

3              THE COURT:  And that's which exhibit?

4              MR. SIPPLE:  That's Exhibit 111.  Actually, I haven't

5    offered that.

6              THE COURT:  You haven't offered it, so it's not into

7    evidence.  But that's the -- let's just say it's the -- it's

8    the exhibit that -- purported exhibit that the plaintiff has

9    provided the Court, frankly, that would be marked Exhibit 111,

10   just so that we're all on the same page.  Okay.

11        All right.  You may continue, Mr. Molsen.

12             MR. MOLSEN:  Thank you.

13   BY MR. MOLSEN:

14   Q.   And did that defendant discuss the formation of Murk

15   Squad?

16   A.   Yes, he did.

17   Q.   And did he say primarily who was responsible for forming

18   Murk Squad?

19   A.   Yes.

20   Q.   And who is that?

21   A.   It's Kylonn Haynie.

22   Q.   Is Kylonn Haynie depicted in Exhibit 28?

23   A.   Yes.

24             MR. MOLSEN:  Your Honor, government would offer

25   Exhibit 28.

Shelton - Direct                                                    12

 1                    MR. SIPPLE:  No objection.

 2                    THE COURT:  Okay.  28 is received.

 3       BY MR. MOLSEN:

 4       Q.    And does Exhibit 28, does that show the date the picture

 5       was posted to Facebook?

 6       A.    My understanding, it shows the date of March 3rd, 2014.

 7       Q.    Okay.  Looking to Exhibit 29, can you tell us what

 8       Exhibit 29 is?

 9       A.    Exhibit 29 is another picture and it bears the words four

10       zero Murk 2x RIP Dezzo, D-E-Z-Z-O, G.

11       Q.    And does the report, according to the picture, does it

12       show from whose Facebook account that was seized?

13       A.    This picture was posted on PoohBearr Badasz's Facebook

14       page.

15       Q.    As part of the investigation did you become familiar with

16       at least some persons' gang monikers?

17       A.    Yes.

18       Q.    Are you familiar with the moniker of Pooh Bear?

19       A.    Yes, I am.

20       Q.    And based on this investigation, who do you know who uses

21       that moniker?

22       A.    Mr. Bahati.

23       Q.    Do you know anybody else who uses that moniker?

24       A.    I'm not familiar with anybody else that uses that moniker,

25       no.

Shelton - Direct                                                    13

1    Q.    Okay.  And so that's the -- the account name is PoohBearr;

2    is that correct?

3    A.    Correct.

4    Q.    Okay.  And does that give a date as to when that picture

5    was posted?

6    A.    This picture says the date of October 28th, 2012.

7    Q.    Okay.  And to your knowledge based on the investigation of

8    this case, is the defendant known to use any other monikers?

9    A.    I'm familiar with one other moniker.

10   Q.    And what moniker is that?

11   A.    Murk Two Times.

12   Q.    Is that shown in Exhibit 29?

13   A.    Yes, it is.

14   Q.    And you said the -- it also contains pictures by the name

15   Dezzo?

16   A.    Yes.

17   Q.    Who is Dezzo?

18   A.    Dezzo -- the Dezzo I'm familiar with is DeAnthony Bryant.

19   Q.    And does it say R-I-P next to him?

20   A.    Yes, it does.

21   Q.    What's your understanding of what R-I-P means?

22   A.    Rest in Peace.

23   Q.    Mr. DeAnthony Bryant, was he killed?

24   A.    Yes, he was.

25   Q.    And how was he killed, if you know?

Shelton - Direct                                          14

1    A.    I'm not familiar exactly with it.

2    Q.    Okay.  Is he -- do you see that Dezzo -- is that a --

3    something you see frequently on tattoos or on social media

4    postings?

5    A.    Yes, it is.

6    Q.    And is that associated with a particular gang?

7    A.    It's associated with -- I'm familiar with one gang in

8    particular that uses it but I know that the moniker Dezzo is

9    used by multiple different people.

10   Q.    Okay.  And which gang is that associated with?

11   A.    40th Avenue Crips.

12   Q.    Okay.

13           MR. MOLSEN:  Your Honor, the government offers

14   Exhibit No. 29.

15           THE COURT:  Any objection to 29?

16           MR. SIPPLE:  No, Your Honor.

17           THE COURT:  29 is received.

18           MR. MOLSEN:  And, Your Honor, if I may, I want to

19   publish Exhibits 19 and 20 and then ask Mr. Shelton some

20   questions about what's -- what's being depicted on them.

21           THE COURT:  You may.

22           MR. MOLSEN:  Thank you.  And I would offer -- if I

23   may first play Exhibit No. 19?

24           THE COURT:  You may.

25           MR. MOLSEN:  Thank you.

1          (Exhibit No. 19 was played.)

2     BY MR. MOLSEN:

3     Q.   Agent Shelton, is the defendant depicted in that video?

4     A.   Yes, he is.

5     Q.   And which one is he?

6     A.   He's the one wearing the red sweatshirt.

7     Q.   Was the defendant seen holding anything in the video?

8     A.   He was.  Yes, I saw that.

9     Q.   And as an ATF agent, are you familiar with firearms?

10    A.   Yes, I am.

11    Q.   Have you had training specifically regarding identifying

12    firearms with interstate nexus?

13    A.   Yes, I have.

14    Q.   Okay.  Are you familiar with -- or do you have an idea

15    what was being held by the defendant in that video?

16    A.   It appears to be an extended magazine.

17    Q.   And is that a -- a magazine -- appear the size and shape

18    consistent as a magazine -- is the size and shape of the

19    magazine, is that consistent as one as for a handgun?

20    A.   It could be used in a handgun, yes.

21    Q.   From what you're able to see in the video, does it appear

22    whether or not any ammunition was contained within the

23    magazine?

24    A.   It does appear so.

25    Q.   And why do you say that?

1    A.   If you look at the end of the top portion of the magazine,

2    it appears to have two different colors.  As it moves around,

3    you can see a darker bronze, almost copper color.  And then

4    underneath that you can see a -- a silver color consistent with

5    ammunition.

6    Q.   Okay.  Did you see other firearms in that video?

7    A.   Yes, I did.

8    Q.   Were -- do you recognize any of the -- any of the other

9    persons in the video?

10   A.   Yes, I do.

11   Q.   Who else did you recognize?

12   A.   I recognized Javon Murry.

13   Q.   And Javon Murry, has he recently been convicted of a crime

14   here in federal court?

15   A.   Yes, he was.

16   Q.   Do you recall the -- at least the nature of the offense?

17   A.   Straw purchasing firearms.

18          MR. SIPPLE:  I'm sorry, I couldn't hear the answer.

19          THE WITNESS:  Straw purchasing firearms.

20          MR. SIPPLE:  Thank you.

21   BY MR. MOLSEN:

22   Q.   And based on your understanding or the investigation in

23   this case, does he have any association with the defendant or

24   the defendant's gang?

25   A.   Yes, he does.

Shelton - Direct                                                              17

1    Q.    Who else did you see in the video?

2    A.    Jermaine Finley.

3    Q.    Was he the one seen holding the camera phone?

4    A.    Yes, he was.

5    Q.    And --

6    A.    I believe it's Jermaine Finley, Jr.

7    Q.    And was -- based on the video, was he seen holding or

8    possessing a firearm?

9    A.    It appears so, yes.

10   Q.    And based on your knowledge of the investigation in this

11   case, does he have any association with the defendant?

12   A.    Yes, he does.

13   Q.    Was there anybody else you recognized?

14   A.    Yes, I recognized Jimmie Windham.

15   Q.    And with Mr. Windham, has he also been prosecuted

16   federally here in the past couple of years?

17   A.    Yes, he has.

18   Q.    Are you familiar with the nature of his case?

19   A.    It was a firearms violation.

20   Q.    And based on your knowledge of the investigation in this

21   case, does he also have a close association with the defendant?

22   A.    Yes, he does.

23   Q.    Anybody else you recognize?

24   A.    Not definitively, no.

25   Q.    Okay.  Thank you.

Shelton - Direct                                                    18

1          MR. MOLSEN:  Your Honor, if I may play Exhibit 20?

2          THE COURT:  Yes, you may.

3      (Exhibit No. 20 was played.)

4  BY MR. MOLSEN:

5  Q.    Agent Shelton, do you recognize the driver in that video?

6  A.    Yes, I do.

7  Q.    Who's the driver?

8  A.    Mr. Bahati.

9  Q.    Did you -- were you able to see the rear driver's seat

10 passenger?

11 A.    The driver's side rear passenger?

12 Q.    Yes.

13 A.    Yes, I was.

14 Q.    And do you recognize that person?

15 A.    I do.

16 Q.    And who do you believe that person to be?

17 A.    I believe that person to be Davonte Swift.

18 Q.    Based on your understanding of the investigation of this

19 case, does Mr. Javonte Swift, does he also have an association

20 with the defendant?

21 A.    It's Davonte Swift.

22 Q.    I apologize.

23 A.    But, yes.

24 Q.    Was he wearing a hat?

25 A.    Yes, he was.

Shelton - Direct                                                19

1    Q.   Did you see the letters on the hat?

2    A.   Yes, I did.

3    Q.   Based on your understanding of the investigation of this

4    case, what's the significance of those letters?

5    A.   The letters JT, often used to refer to Johntavious Swift.

6    Q.   Was Johntavious Swift a Crip member here in Omaha,

7    Nebraska?

8    A.   To my knowledge, yes.

9    Q.   And is he still alive?

10   A.   No, he's not.

11   Q.   What happened to him?

12   A.   He was killed in a homicide.

13   Q.   And the driver's side rear passenger, was he seen holding

14   a firearm in that video?

15   A.   What appears to be a firearm, yes.

16   Q.   Were you able to see the passenger side rear passenger?

17   A.   Yes, I was.

18   Q.   And is that the person -- does that appear to be Jermaine

19   Finley again?

20   A.   Yes, it does.

21   Q.   And does he appear to be holding the camera phone again?

22   A.   Yes, he does.

23   Q.   Did you notice anything in his lap?

24   A.   Yes, it appeared to be a 1911-type pistol.

25   Q.   Okay.

Shelton - Cross                                                        20

1          MR. MOLSEN:  I have no further questions regarding

2    number 20.

3         And no further questions for this witness, Your Honor.

4          THE COURT:  All right.  Cross-examination.

5          MR. SIPPLE:  Thank you.

6                     CROSS-EXAMINATION

7    BY MR. SIPPLE:

8    Q.   Agent, you first discussed an incident on April 23rd where

9    law enforcement searched Rita White's house, correct?

10   A.   Yes.

11   Q.   And you said that you're familiar with the reports and the

12   investigation regarding those events?

13   A.   Correct.

14   Q.   You're the case agent in this case, right?

15   A.   Correct.

16   Q.   So I assume you're also familiar with the reports

17   surrounding the incident occurring earlier that evening alleged

18   in Count Eight and involving Shalet Richardson?

19   A.   Somewhat.

20   Q.   All right.  You're aware that it happened the same night?

21   A.   Yes.

22   Q.   And, in fact, it happened within 20 or 30 minutes of

23   officers arriving at Miss White's house; is that right?

24   A.   To my knowledge and understanding of it, yes.

25   Q.   And so --

Shelton - Cross                                                    21

1    A.   It was a short time prior, I don't know the exact --

2    Q.   Thank you.  And --

3              MR. MOLSEN:  Your Honor, if we could approach for a

4    brief second?

5              THE COURT:  Yes, you may.

6              MR. MOLSEN:  All right.  Thank you.

7         (At sidebar)

8              MR. MOLSEN:  Mr. Sipple and I both understand who the

9    people are involved, but Shalet's cooperating and we're

10   concerned about witness safety when the names are mentioned in

11   court, so if we could, if we can just refer to them as victims,

12   either by victim of the indictment or some other manner so

13   they're not mentioned, the name.

14             THE COURT:  Okay.  All right.  So what do we do now

15   that the cat's out of the bag?

16             MR. SIPPLE:  Whatever you want.  I didn't mean to do

17   that.  She's been in my office.  I don't think there's an issue

18   with her, otherwise I probably would have been -- it probably

19   would have occurred to me not to say her name, but I didn't

20   mean to and you can do whatever you want.

21             MR. MOLSEN:  She's referred to in the indictment

22   as victim number 5, so just moving from this point forward if

23   we could --

24             THE COURT:  All right.  Just call her victim

25   number 5.  All right.

1          MR. MOLSEN:  Thank you.

2      (In open court)

3          THE COURT:  You may proceed, counsel.

4    BY MR. SIPPLE:

5    Q.    So turning back to your testimony about the fact that

6    officers searched Miss White's home on April 23rd and located

7    or seized a telephone, that was Mr. Finley's phone?

8    A.    To my knowledge, yes.

9    Q.    Okay.  And Mr. Molsen asked if officers located other

10   items during that search.  You're familiar that they found a

11   couple of guns in an attic?

12   A.    That's correct.

13   Q.    And, in fact, officers reported hearing sounds indicating

14   to them that perhaps the guns had been secreted in the attic

15   prior to their ability to gain entry into the home; is that

16   right?

17   A.    I -- that's my understanding, yes.

18   Q.    And, of course, when guns are found in a situation like

19   that, officers check to see if they were loaded?

20   A.    Typically, yes.

21   Q.    And they were loaded in this case?

22   A.    I'm not familiar with that.  I don't know.

23   Q.    Now, do you have the exhibits in front of you, sir?

24   A.    Yes, I do.  I have 28 and 29.

25   Q.    Thank you.  I'd like to ask you some questions about

Shelton - Cross                                                           23

1    Exhibit No. 28.  As I understand it, there are five individuals

2    depicted in that photo, correct?

3    A.    I see six.

4    Q.    You're right.  The individual on the far right as you look

5    at the photo, can you identify that person?

6    A.    No, I don't -- I don't know who that person is, no.

7    Q.    And the individual on the far left, can you identify that

8    individual?

9    A.    No.

10   Q.    And the individual second from the left, can you identify

11   that individual?

12   A.    In the back?

13   Q.    Yes.

14   A.    More towards the back?  No.

15   Q.    The three in the middle are Mr. Bahati, Mr. Finley, and

16   Mr. Kylonn Haynie?

17   A.    Correct.

18   Q.    Kylonn Haynie has not been indicted for any federal

19   criminal offense; is that right?

20   A.    To my knowledge, no.

21   Q.    And to your knowledge, he's not in custody in state court

22   for any alleged offense; is that right?

23   A.    That's correct.

24   Q.    And since you don't know who the others that we talked

25   about are, you don't know that they've committed any federal

1    crimes or been indicted and accused of any federal crimes?

2    A.    Not to my knowledge.

3    Q.    Now, that leads to this:  Through the course of your

4    investigation, did you learn that Murk not only referred to

5    what you allege to be a group formed to commit retaliatory

6    shootings, but it also referred to a rap group; is that right?

7    A.    It does refer to a rap group and I believe what you're

8    referring to is the indictment alleges what Murk Squad does,

9    correct?

10   Q.    Right.

11   A.    Okay, yes.

12   Q.    But it's also a rap group, right?

13   A.    To my knowledge and understanding, yes, it is.

14   Q.    Well, in fact, agents, as part of your investigation,

15   attended at least one performance of the group and -- and took

16   video of it; is that right?

17   A.    I believe so, yes.

18   Q.    And there's no allegations in the indictment related to

19   that event where they were publicly performing rap music, is

20   there?

21   A.    I wasn't present during the concert, but there is nothing

22   that I'm familiar with --

23   Q.    Yeah.  You're --

24   A.    -- related to being charged, no.

25   Q.    And you're the case agent so you'd be expected to know,

1   right?

2   A.   I'm one of them.

3   Q.   All right.  And in the discovery, am I right, that there's

4   also several professionally produced music videos created by

5   members of the rap group called Murk, right?

6   A.   I'm familiar with -- with videos.  I -- I don't know who

7   produced them or how they were produced.

8   Q.   Well, but at least on their face, they begin with what

9   appears to be the name of a record company, right?  Or a -- or

10  a video producer?

11  A.   I -- I -- what I'm familiar with is -- is, like, there's a

12  picture at the start of the video that looks like an album

13  cover.  I don't know what it says.

14  Q.   And they're edited?

15  A.   Correct.

16  Q.   You're not going to tell this judge that they don't appear

17  to be professionally produced, are you?

18  A.   That's not what I'm saying.  I'm just saying I don't know

19  who produced them.

20  Q.   Okay.  You don't contend that they were produced by

21  amateurs or with a telephone or something like that?

22  A.   I -- I don't know how they were produced.

23  Q.   Now, CI 1355, it's my understanding that the government

24  intend to call him -- call him as a witness in the event this

25  case proceeded to trial.  Is that your understanding?

1    A.    Yes.

2    Q.    He was an important part of the government's

3    investigation?

4    A.    Yes.

5    Q.    And why was he so important?

6    A.    He was a gang member.

7    Q.    He had -- he purported to have knowledge of not only the

8    Crips gangs that we're talking about but of this Murk Squad

9    that's alleged in the indictment?

10   A.    Correct.

11   Q.    Not just hearsay, but personal knowledge.

12   A.    Yes.

13   Q.    Did he admit being a member of Murk Squad?

14   A.    I don't believe so.  I believe it was similar time frames

15   from when he began cooperating with the government.

16   Q.    But he was familiar with many of the members of the 40th

17   or 44th Avenue Crips, right?

18   A.    Correct.

19   Q.    And, in fact -- well, first of all, you -- you asked --

20   not you, but agents asked him to identify the people that were

21   present when Murk Squad was formed, right?

22   A.    Yes.

23   Q.    And when -- when asked, he named a number of individuals,

24   right?

25   A.    Correct.

Shelton - Cross                                                27

1    Q.    And he named them by nickname and by their real name?

2    A.    Yeah, I believe that's correct, yes.

3    Q.    And when he named those individuals, he did not name

4    Mr. Bahati; is that right?

5    A.    That's correct.

6    Q.    Now, when Mr. -- or when the informant was -- this

7    informant with all this knowledge was interviewed about these

8    matters, did investigators ask specifically about different

9    suspects and their knowledge of them?

10   A.    I'm not familiar with -- with that.

11          MR. SIPPLE:  May I approach?

12          THE COURT:  Yes.

13          THE WITNESS:  I wasn't present during the...

14          MR. MOLSEN:  Can I see it?

15          MR. SIPPLE:  Oh.  It's a -- you have it.

16      (Counsel conferred.)

17   BY MR. SIPPLE:

18   Q.    Do you have before you Exhibit No. 111?

19   A.    Yes, I do.

20   Q.    And what is that?

21   A.    It appears to be a -- it appears to be an ATF report.

22   Q.    In conjunction with this investigation?

23   A.    I would have to see the header portion to see, but, yes, I

24   believe it relates to this investigation.

25   Q.    Do you want to take time to read it and tell us?

Shelton - Cross                                               28

1   A.    What I'm saying, I guess, with that is, there's several

2   different investigations that are going on and to specifically

3   answer your question I would like to see what case number was

4   typed on the report to answer that.

5   Q.    Okay.  Well, let me ask you this way then, Agent:  Is this

6   a report that refers to an interview conducted of an informant

7   numbered 13- -- well, is this a report that refers to an

8   interview of informant 1355?

9   A.    Yes.

10  Q.    And was it conducted by ATF Officer Daniel Torres and ATF

11  Special Agent Donnie Mann?

12  A.    Yes.

13  Q.    And were they both officers that worked in conjunction

14  with this investigation?

15  A.    Yes.

16  Q.    So we have officers as part of this investigation

17  interviewing an important informant in this investigation.

18        You'll at least agree with that --

19  A.    Yes.

20  Q.    -- right?

21        All right.  Now, when those -- according to the report,

22  when those officers -- and I'll direct your attention to

23  paragraph 22 on the last page.  When those officers

24  specifically asked this person with knowledge who was going to

25  testify at trial about Mr. Bahati, according to the report, was

1    he able to describe any criminal activity that Mr. Bahati had

2    participated in?

3    A.    He does not specifically list any -- any specific crimes

4    or instances of violence, no.

5    Q.    So whatever knowledge he had, he apparently didn't have

6    any knowledge of Mr. Bahati participating in any retaliatory

7    shootings or anything like that?

8    A.    Not according to this portion of the report.

9    Q.    All right.  Now, I want to ask you some questions about

10    the videos that were marked as Exhibits 19 and 20.

11        You identified Javon Murry as one of the individuals in

12    the videos, right?

13    A.    Correct.

14    Q.    And you indicated that he was prosecuted in federal court

15    for a gun offense?

16    A.    Yes, straw purchasing.

17    Q.    Do you recall what his sentence was?

18    A.    I don't, no.

19    Q.    It was less than five years?

20    A.    I believe so, yes.

21    Q.    And also, in Exhibit No. 19, the video, is Jermaine

22    Finley?

23    A.    Yes.

24    Q.    And do you disagree with me that he was sentenced by Judge

25    Bataillon to 24 months?

Shelton - Cross                                                    30

1    A.   I don't know exactly but I would say it was less than five

2    years, yes.

3    Q.   And Jimmie Windham was another person you identified?

4    A.   Yes.

5    Q.   He also pled guilty down in Lincoln, I believe, to a gun

6    offense; is that right?

7    A.   I'm not familiar with that.

8    Q.   I don't know why I say Lincoln.  I think it may have been

9    presided over by -- by Judge Kopf.  But do you agree that he

10   was sentenced to less than five years?

11   A.   I don't know Jimmie Windham's sentencing.  I know that he

12   was charged federally but I'm not aware of what his sentence

13   was.

14   Q.   Are you aware that he was charged with being user of a

15   controlled substance in possession of a firearm?

16   A.   Yes.

17   Q.   All right.  So from what I gather, with respect to

18   Exhibit 28 and the Exhibits 19 and 20, the individuals depicted

19   in those photographs, whether it be video or Facebook

20   photograph, either you don't know who they were or they've not

21   been indicted at all or they were indicted and sentenced to

22   less than five years?

23   A.   I believe you're correct, yes.

24   Q.   Thank you.

25        MR. SIPPLE:  That's all the questions I have,

Shelton - Redirect                                              31

1    Your Honor.

2                  THE COURT:  Redirect, counsel?

3                  MR. MOLSEN:  Yes, Your Honor.

4                        REDIRECT EXAMINATION

5    BY MR. MOLSEN:

6    Q.   Mr. Shelton, is this case -- does it involve thousands of

7    pages of reports?

8    A.   Yes, it does.

9    Q.   Are you familiar with all of them?

10   A.   No, I'm not.

11   Q.   Okay.  Are you familiar with all of the members of the

12   Crip gangs in Omaha?

13   A.   No.

14   Q.   So just because you don't know somebody, does that mean

15   they're not a gang member?

16   A.   No.

17   Q.   Okay.  According to the report you looked at regarding

18   CI 1355, does he indicate who the founder of Murk Squad is?

19   A.   Do you have a paragraph or...

20   Q.   Or maybe not even according to the report.  Do you know

21   generally, did he refer to who the founder of Murk Squad was?

22   A.   I believe it was Kylonn Haynie.

23   Q.   Okay.  Is he depicted in Exhibit 28?

24   A.   Yes, he is.

25   Q.   Okay.  Now, did CI 1355, did he indicate that part of the

Shelton - Redirect                                              32

1   purpose of the group was to produce rap songs?

2   A.   I believe so, yes.

3   Q.   And did he indicate what any other purpose of the group

4   was?  Did they have additional purposes?

5   A.   To retaliate to other rival gangs.

6   Q.   And when you say "retaliate," what do you mean?

7   A.   Commit shootings and acts of violence.

8   Q.   Okay.  So we don't -- so from what we know, the defendant,

9   Mr. Bahati, might not have been at the first meeting when it

10  was initially formed; is that correct?

11  A.   Correct.

12  Q.   Okay.  Is Mr. Bahati depicted in Exhibit 28 under the

13  banner of Murk -- Team Murk?

14  A.   Yes, he is.

15  Q.   Okay.  Regarding -- you were asked about paragraph 22 of

16  that report.  Do you recall or do you know or were you present

17  for that -- were you present for this interview?

18  A.   I don't believe I was.  I don't recall any of this, no.

19  Q.   Okay.  So regarding information given in paragraph 22, do

20  you know what -- specifically what questions were asked when he

21  produced that answer?

22  A.   No, I don't.

23  Q.   So do you know if he was even asked about criminal

24  activity at that point?

25  A.   No.

Shelton - Recross                                          33

1    Q.    You were asked about Javon Murry, Finley, and Windham,

2    people who have also been prosecuted here.  Are you at least

3    generally familiar with the types of cases that they had?

4    A.    Yes.

5    Q.    Okay.  Did any of those cases involve allegations of

6    robberies being committed by them?  Were they charged with

7    robberies, as far as you know?

8    A.    No.

9    Q.    Did any of those people involve allegations of pointing

10   firearms at people?

11   A.    No.

12   Q.    Did any of those people involve allegations of threatening

13   people?

14   A.    No.

15   Q.    Okay.  Did they involve any violence, the allegations in

16   the indictments?

17   A.    Not that I'm familiar with, no.

18          MR. MOLSEN:  I have no further questions, Your Honor.

19          THE COURT:  Follow-up, Mr. Sipple?

20          MR. SIPPLE:  I think --  Thank you.

21                          RECROSS-EXAMINATION

22   BY MR. SIPPLE:

23   Q.    So some of the people in this association were nonviolent?

24   A.    I wouldn't say that.  I would say the charges -- that

25   there was no -- no violence in the specific charge that they

Shelton - Recross                                                    34

1    were charged with.

2    Q.   And some weren't charged at all?

3    A.   I don't know if they're charged or not.  I don't recognize

4    the faces.  That doesn't mean they have not been charged

5    elsewhere.

6    Q.   All right.  Thank you.  That's all.

7              THE COURT:  Any follow-up, counsel?

8              MR. MOLSEN:  No, Your Honor.

9              THE COURT:  All right.  You may step down, Agent.

10   Thank you very much.

11                              * * *

12                   END OF REQUESTED PROCEEDINGS

13

14

15

16

17

18

19                   C E R T I F I C A T I O N

20       I, Susan M. DeVetter, RDR, CRR, certify that the foregoing

21   is a correct partial transcript from the record of proceedings

22   in the above-entitled matter.

23

24    /s/ Susan M. DeVetter              September 27, 2017
       Official Court Reporter                    Date

25